COHEN & BUCKLEY, LLP
1301 York Road
Baltimore, Maryland 21093
(410) 321-4750
Michael L. Cohen, Esq.
(Motion for Admission *Pro Hac Vice* pending)
Richard P. Regan, Of Counsel

-and-

SPIZZ COHEN & SERCHUK, P.C.
425 Park Avenue
New York, New York 10022
(212) 754-9400
Alex Spizz, Esq. (AS-5508)
Joseph P. Cervini, Jr., Esq. (JC-6143)

*Attorneys for Plaintiff, SLS Capital, S.A. (In Liquidation)*
*Maître Yann Baden, Foreign Representative*

**14 CV     6846**



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SLS Capital, S.A. (In Liquidation)<br>Maître Yann Baden, Foreign Representative<br>Baden & Baden<br>27, rue J.B. Esch<br>L-1473 Luxembourg<br>Luxembourg | |
| | Case No. 14-_____ |
| Plaintiff, | **COMPLAINT** |
| -against- | |
| HSBC Bank USA, N.A., | |
| Defendant. | |

     SLS Capital, S.A., In Liquidation ("SLS"), through its duly appointed Foreign

Representative, and by its undersigned counsel, sues HSBC Bank USA, N.A., and alleges as

follows:

## PARTIES

1.      SLS is a Luxembourg Société Anonyme with its principal place of business in Luxembourg.  It was placed into liquidation by Order of the Luxembourg District Court on October 1, 2009.  Maître Yann Baden (Baden) is its liquidator.  By Order dated July 25, 2012, the U.S. Bankruptcy Court for the Southern District of New York, recognized the Luxembourg liquidation as a foreign main proceeding pursuant to Chapter 15 of the U.S. Bankruptcy Code, and Baden as its Foreign Representative.  The Court further held that Baden in his official capacity as Liquidator and Foreign Representative may bring an action in any court of the United States with jurisdiction as he deems appropriate pursuant to 11 U.S.C. § 1509(b).  SLS brings this action on behalf of its Estate in liquidation and on behalf of the creditors of its Estate.  As SLS's Liquidator, Baden has standing under Luxembourg law to act on behalf of the Estate of SLS and its creditors in bringing this action.

2.      Defendant HSBC Bank USA, N.A. (HSBC) is the principal subsidiary of HSBC USA Inc., an indirect, wholly owned subsidiary of HSBC North America Holdings Inc. HSBC operates some 240 branch offices throughout the United States.  HSBC is incorporated and domiciled in Virginia, with its principal place of business in New York.  It has in excess of $170 billion in assets, and is the US operating arm of one of the world's largest international banks, HSBC Holdings, PLC, located in London.

## JURISDICTION

3.      This Court has jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a)(2), because the action is between citizens of a state and citizens or subjects of a foreign state within the meaning of 28 U.S.C. § 1332(c)(1), and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

4.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(1), because the defendant has its principal place of business and/or resides in this District, or under 28 U.S.C. § 1391(b)(2), because a substantial part of the events and omissions giving rise to the claims occurred in this District.

## PRELIMINARY STATEMENT

5.      HSBC was involved with a major international fraud.  The instigator of the fraud, David Elias (Elias), previously implemented and controlled a collapsed investment scheme in the United Kingdom in which many of the investors were wiped out due to his dubious management and accounting.  As respects the current action, Elias orchestrated a fraudulent scheme which raised over $250 million from mostly private investors, many of whom had modest means, who bought bonds issued by SLS.  The bonds were secured by a portfolio of life insurance policies acquired in the secondary market from the original insureds.  Elias, aided and abetted by others, aggressively marketed the bonds as conservative investments.  They turned out to be anything but.

6.      Although the planned structure under which SLS was to operate should have produced acceptable investment results, it soon became obvious to insiders that SLS's business model, including the portfolio of life policies which served as the bondholders' collateral, was in trouble when SLS could not implement some crucial aspects of the planned structure.  Faced with the choice of returning investor funds or defrauding the investors and keeping the monies raised from them, Elias and others took actions which deceived the investors and improperly postponed a default on the bonds while they siphoned off the investors' collateral.   The pilfered funds were used to invest in other far riskier ventures unrelated to SLS and to support Elias' lavish lifestyle, complete with corporate jets, luxury yachts, and island resorts.

3

7.     HSBC played a critical role in the eventual demise of SLS.  Among other things, HSBC served as custodian of the life policies that secured SLS's bonds.  Under its watch, Elias conspired with others to rapidly liquidate the entire portfolio at well below market value and steal the proceeds.  HSBC not only failed to prevent these transactions, but provided substantial assistance.  HSBC had concerns about its involvement in the SLS scheme early on, but failed to take effective action in response to those concerns.  It allowed investors to believe incorrectly that HSBC was acting as trustee for their benefit, and yet the bank ignored multiple "red flags" that should have led it to investigate suspicious activity at SLS.  HSBC's failure to conduct such an inquiry enabled Elias and others to cover up their massive ongoing fraud until it was too late.

8.     All told, the loss of investor funds due to Elias' fraudulent actions was over $250 million, plus unpaid interest and other expenses.  It is left to Baden, as the Liquidator and Foreign Representative of SLS, to recover for the Estate and its creditors, comprised almost totally of the SLS bondholders, so that these bondholders can be fairly compensated for the fraud of which they were the victims.  Simple justice demands that HSBC be called to account for its role in that fraud.

## BACKGROUND

9.     BWT Holdings, Ltd. (BWT) is a Malaysian company located in Labuan, Malaysia.  At all applicable times, BWT was controlled by Elias, who directly or indirectly owned all shares of BWT.  BWT is currently in liquidation.

10.     When Elias formed SLS in November, 2004, BWT was the majority shareholder with one share held by a second entity controlled by Elias.  The directors of SLS were companies existing for the purpose of providing corporate directors and owned by Mees Pierson Intertrust (MPI).  In addition to providing directors, MPI administered SLS and performed all of SLS's

corporate functions, including disbursing funds to pay SLS's obligations, communicating with SLS's shareholders and bondholders, and engaging SLS's auditors.  MPI is a large trust company and a subsidiary of Fortis Bank (Fortis), a major international bank.  At some point MPI was renamed Fortis Intertrust.

11.     Elias intended to use SLS as a vehicle to raise capital by selling collateralized bonds, a form of asset backed securities (ABS).  His goal was to exploit market inefficiencies by buying undervalued asset classes with the proceeds from the sale of SLS bonds.  These bonds are part of an asset class investment professionals commonly termed "exotic."  The bonds would be marketed to potential investors and would be collateralized by the assets purchased with the bonds' principal.

12.     The particular assets that Elias decided SLS would purchase were a portfolio of senior life settlements, a term used to denote the purchase of previously issued life insurance policies.  Companies in the life settlement business purchase life insurance policies insuring older individual insureds and, on the insureds' death, collect the policies' death benefits or face value.  The sooner the insureds die, the faster the business recoups its investment.  If people live longer than expected, the expected returns are delayed.

13.     In March 2005, SLS entered into contractual arrangements with U.S. companies to assist it with assembling and maintaining SLS's life insurance policy portfolio.  These companies included, in addition to HSBC: CRT Capital Group, LLC ("CRT"), a Delaware corporation with its principal place of business in Connecticut, which acted as advisor to SLS; and Life Settlement Solutions, Inc. ("LSS"), a California corporation with its principal place of business in that State, which acted as the procurer and servicer of the life insurance policies.  The various parties entered into a series of contracts that documented their roles with respect to SLS

and the process by which the life insurance portfolio would be acquired and maintained. These documents were assembled into a single volume that some of the parties referred to as "The Bible." Collectively, these documents comprised the contractual matrix within which SLS was supposed to function.

14.     CRT is an investment banking and advisory firm that advised Elias regarding SLS' structure, including the issuance of its bonds. On March 14, 2005, CRT purchased fifty five percent (55%) of SLS's shares, and was engaged to advise SLS concerning the mix of life settlement contracts and other assets to be acquired and owned by SLS.

15.     LSS is a licensed provider of life settlements. Acting on behalf of third parties, it procures life insurance policies from owners who wish to sell them, but by statute and regulation it is not permitted to obtain policies for its own account. On March 14, 2005, LSS entered into an Origination Agreement with SLS in which it agreed to perform that function for SLS as well as service the policies (e.g., pay premiums, collect death benefits, and communicate with insurers and insureds). The Terms and Conditions of SLS's bonds limited SLS to purchasing life insurance policies issued by U.S. and Canadian life insurers with a credit rating of A or better. A key feature of the Origination Agreement was a set of actuarially determined parameters that limited which policies SLS could purchase in order to ensure that the proceeds from the death benefits would be timed to align with SLS's cash flow requirements. These purchase parameters are contained in Exhibit A to the Origination Agreement, which is attached and incorporated herein as Exhibit 1.

16.     On or about March 14, 2005, HSBC entered into two contracts with SLS: a Financing Entity's Securities Account Control Agreement and a Verification and Payment Agency Agreement, which are attached and incorporated herein as Exhibits 2 and 3. LSS was

6

also a party to its own separate Securities Account Control Agreement with HSBC. As securities intermediary, HSBC agreed to hold the insurance policies purchased by SLS and served as legal owner of the policies for the beneficial interest of SLS. As verification and payment agent, HSBC was responsible for ensuring that the policies procured by LSS conformed to the parameters set out in Exhibit A of the Origination Agreement. As payment agent, HSBC was responsible for disbursing funds it held on behalf of SLS based on valid authorizations from SLS's directors to pay SLS's obligations in the U.S., including all payments associated with the purchase of policies.

17.    All funds SLS raised were initially deposited into Fortis in Luxembourg. Fortis, in turn, transferred funds to HSBC at the direction of MPI, as required to meet SLS's obligations in the United States.

18.    BWT's role in the structure was to raise capital by soliciting investments in SLS's bonds. In this role, it marketed to distributors of financial product. Most of the investors in SLS bonds were private individuals who invested either by purchasing bonds from SLS directly or by purchasing bonds that were issued by a British distributor, Keydata Investment Services (Keydata), and securitized by SLS.

19.    SLS issued four tranches of ABS bonds designated Tranches A-D. The collateral for all tranches were commingled. A set of Terms and Conditions (T&C's) controlled each tranche. The T&C's for each tranche are attached and incorporated herein as Exhibits 4-7. All T&C's provided for a "Required Asset Cover" (RAC).[1]  The RAC served to ensure that the

---

1.    "Required asset coverage" is a commonly used financial metric that takes into account the volatility of illiquid assets in assessing a company's ability to cover its debt obligations with its assets by building in a cushion over book value. This metric is usually expressed as a ratio of total assets to debt and requires the former exceed the latter by a specified margin.

collateral exceeded the amount of principal raised by a specified margin in order to provide a measure of security for the bondholders.

20.    The RAC contained in the T&C's required that the combined face value (death benefit) of all life insurance policies SLS purchased be equal "at all times" to two times  the principal raised less any cash or cash equivalents held in SLS's accounts.

21.    Although subject to cure under specified conditions, the failure to maintain the RAC at or above the required ratio constituted an event of default under the T&C's.

22.    The T&C's required a certification at the end of each quarter that the RAC was in compliance with the 2:1 ratio.  CRT had the responsibility for calculating the quarterly RAC and certifying it.

### The Brief Trajectory of SLS

23.    In September 2004, even before BWT had formed SLS, it had solicited investments for ABS bonds collateralized by life settlements.

24.    Several distributors marketed the first tranche of bonds which included all SLS bonds issued before September 2005.  The remaining three tranches consisted of individual bonds issued to Keydata, which issued its own bonds backed by the SLS bonds it held.  The total amount SLS raised was about $250 million.

25.    In the absence of a credit facility, there was an inherent problem in SLS's structure in that the portfolio could not early on generate sufficient cash flow to support the payment of policy premiums, bond interest and other expenses.  Beginning in the second quarter 2006, SLS failed to meet the required 2:1 RAC.  Although it was first aware of this situation in July 2006, CRT at first concealed the problem from SLS's directors at MPI and only disclosed it under pressure from MPI in October 2006.  The failure of SLS to maintain the RAC led to

significant contention with MPI.  MPI threatened to stop paying interest on the bonds, to notify the bondholders of an event of default, and to seek a bondholder vote to require return of all principal and interest, which would effectively liquidate SLS.

26.     MPI resigned in early April 2007 over the RAC issue.  Elias replaced MPI first with Equity Trust, a Luxembourg company, and eventually with ITMC, a trust company domiciled in Labuan, Malaysia, both of which provided directors for SLS.

27.     In September 2007 CRT resigned as SLS's advisor and sold its majority stake in SLS to Life Settlements Capital, S.A. (LSC), another Luxembourg life settlements fund beneficially owned by Elias.  Elias replaced CRT as advisor with CIB Partners, Ltd. (CIB).

28.     Arnold Eber (Eber) was the principal of CIB.  CIB continued the practice of issuing false RAC certifications and engaging in other acts of dishonesty.  The UK financial regulator, the Financial Services Authority (FSA), now known as the FCA, subsequently investigated Eber and issued a Final Notice regarding his actions at CIB.  In connection with its investigation, the FCA issued a report of Elias's activities outlining Eber's participation at CIB.  A copy of this report is attached and incorporated herein as Exhibit 8.

29.     Elias' strategy was to inflate the RAC by changing the mix of insurance policies in SLS's portfolio.  These changes were made without regard to the parameters in the Origination Agreement.  The main criterion for policy purchases was to buy as much face value/death benefit for as little cost as possible in order to meet the required RAC using as little capital as possible.  Elias also decided that he could use any cash held in excess of RAC requirements to invest in other ventures unrelated to SLS, so this tactic freed up SLS funds for Elias' own purposes unrelated and of no benefit to SLS.

30.     BWT and CIB also engaged in lending and selling policies between SLS and LSC in what amounted to a shell game in which the same policies were used to meet the RAC for both companies.  Again the purpose was to enable SLS and LSC to falsify the RAC.

31.     By early 2008, SLS was nearly out of cash and could not meet premium payments, interest payments on bonds, and servicing fees going forward without resorting to policy sales.  Instead of selling just enough policies to fund ongoing expenses, CIB enlisted HSBC's help in rapidly selling large groups of policies at below market prices.  Elias had decided to liquidate SLS's entire portfolio in order to pursue other more aggressive investment strategies in vehicles outside SLS and to use SLS to fund his lavish lifestyle.  In a matter of just a few months, the entire SLS portfolio was sold off.  By October 2009, when SLS was put into liquidation, it had no assets.  SLS's bonds were worthless.  The bond investors lost everything.

### HSBC's CRUCIAL ROLE IN THE SLS SCHEME

**A.    HSBC allowed itself to be falsely held out as US Trustee for the bonds**

32.     In February 2005, SLS's attorneys advised that SLS did not require a Delaware statutory trust, so HSBC would instead hold the policies as a securities intermediary.  In the Securities Account Control Agreement entered in March 2005, HSBC became the Securities Intermediary for SLS.

33.     Despite this change, the parties continued to refer to HSBC as "US Trustee."  At least through the end of 2005, HSBC was still held out to investors and potential investors in marketing materials as the "US Trustee."  The T&C's of the ABS bonds referred to HSBC as US Trustee, as did "Fact Sheets" distributed to potential investors.  See, e.g., Exhibit 4 at 3 & Exhibit 9 at 2, which are attached and incorporated herein.  The T&C's stated that HSBC would "hold in trust for the Issuer [SLS]" the eligible assets purchased with investor funds.

34. As HSBC was aware, there was in fact no US Trustee for the SLS bonds. HSBC knew by November 2005 that Keydata identified HSBC as the US Trustee for its Secure Income Bonds, which were derivative instruments providing proportional interests in SLS bonds that Keydata held nominally. A copy of the Keydata sales brochure provided to HSBC, which described the bank as "Trustees for the Bond," is attached and incorporated herein as Exhibit 10. HSBC complained to SLS in a letter dated December 14, 2005, copied to CRT and the Office of the Comptroller of the Currency, HSBC's federal regulator. In that letter, HSBC characterized the description of its role in Keydata's brochure as "materially misleading." HSBC noted that its role was limited to custodial services and that it was not involved in the Keydata product.

35. HSBC demanded that Keydata write its investors who received its marketing materials and clarify that HSBC had no involvement with SLS and the Secure Income Bond. While Keydata quickly agreed to remove all references to HSBC from its website and future marketing material, it rejected the accusation that its references to HSBC were misleading. Keydata informed HSBC that it would not notify investors that HSBC had no involvement, because the documentation for the SLS bonds underlying Keydata's product indicated to the contrary.

36. HSBC never responded or pressed SLS or Keydata to correct identification of the bank as the trustee of the bonds. HSBC's internal communications show that HSBC was more concerned with the unauthorized use of the bank's name than with the fact that Keydata had fraudulently misled its investors to believe that HSBC held the security for their bonds as trustee.

37. HSBC knew by December 2005 that the investors had been falsely told HSBC was the trustee for the bonds and that Keydata had refused to correct those false statements.

Still, HSBC made no further attempts to investigate Keydata nor did it try to ensure that the investors were informed of the falsity of these representations that HSBC was the trustee.

**B.**     **HSBC was warned that Keydata resembled a "Ponzi scheme."**

38.     At the same time it learned of Keydata's misrepresentation of its role to investors, HSBC received another warning about the Keydata investments. A UK financial advisor told HSBC that "the entire structure presented by Key Data [sic] looks like a Ponzi scheme" and appeared to have links to Elias. An email concerning this warning is attached and incorporated herein as Exhibit 11. HSBC was aware by this time of the link between Keydata and SLS. But again, this new red flag did not spur HSBC to warn the investors. Nor did HSBC investigate these warnings.

39.     Acting only in its own interest, HSBC chose instead to try to terminate its agreements with SLS. On February 22, 2006, HSBC resigned as Securities Intermediary and Verification and Payment Agent. The agreements with SLS required, however, that HSBC continue in its duties until SLS found a replacement. HSBC had the right to petition a court to appoint a successor if one had not been found within a "reasonable time" but never exercised that right.

40.     HSBC continued to perform its roles under the agreements for the next twenty months until October 2007 when it sent a second resignation letter threatening to seek relief in court if SLS did not name a successor. HSBC never did seek judicial relief. It continued to act as securities intermediary and perform verification and payment services for SLS until finally closing the SLS account at the end of 2008. During the intervening period, HSBC continued to earn fees servicing SLS and found related opportunities to supplement its fee revenue by assisting SLS with the liquidation of its portfolio of life settlement policies. Despite the

warnings it had received about Elias, Keydata, and the earlier misrepresentation, HSBC failed to make any inquiries into the rapid liquidation of SLS's portfolio even though it knew the life insurance policies comprised the collateral for SLS's bonds. HSBC never took steps to ensure that investors were informed that HSBC's role had been misrepresented and that in reality there was no trustee of the bond.

   **C.    HSBC assisted David Elias' and CIB's diversion of more than $11.3 million of SLS's funds to an unauthorized investment in Amazonian Rainforest Land.**

   41.   In December 2007, HSBC assisted in the conveyance of beneficial interests in some policies to SLS by transferring the purchase money from SLS' cash account without proper authorization. LSC held these beneficial interests in twenty two policies and arranged to sell the interests to SLS for a total of $17.3 million. LSS facilitated the transaction, and SLS was to acquire the interests from LSC, with SLS to pay $11.3 million of the purchase price as a first installment at closing. By this time, SLS had become a wholly-owned subsidiary of LSC. Thus the transaction was not arms' length, because it involved a corporate parent selling assets to its subsidiary. In reality, the purpose of this transaction was to allow Elias to execute his new plan to use investor funds, in breach of the T&C's, to invest in a transaction unrelated to SLS – the purchase of land in the Amazonian rainforest in order to issue "Rainforest Bonds" supported by the sale of carbon credits that would accrue in respect of the virgin land purchased. Even this asset vanished. As it turned out, Elias never acquired good title to the land.

   42.   Prior to the closing of the LSC-SLS sale, the directors of SLS requested that HSBC verify that the twenty two policies involved conformed to SLS's purchase parameters, and the bank undertook to review policy documentation and use the usual verification checklist to confirm that the policies met each purchase parameter.

43.     By this time, CIB had replaced CRT as SLS's Advisor.   Thomas Musarra (Musarra), the HSBC officer who oversaw the verification process, told CIB that HSBC would take two days to verify the policies, unless SLS elected to waive the requirement.   Freddie Acebedo of HSBC conveyed a similar message to Stroock, Stroock & Lavan, LLP (Stroock), the lawyers acting on behalf of LSC, that funds could not be released until the bank had verified their conformity to the purchase parameters.

44.     The process of verifying the twenty two policies hit a snag on December 27th when it turned out that the SLS did not have current Life Expectancy Reports for some of the policies as required.   Mark Inigo (Inigo) at HSBC then informed CIB that if SLS provided a waiver of the purchase parameters for the policies, HSBC would agree to release the purchase funds.   A copy of this email is attached and incorporated herein as Exhibit 12.   Inigo faxed Eber a copy of a previous waiver letter, signed by two SLS directors and LSS, to use as a model.   Eber immediately used this document to produce a letter signed by CIB rather than SLS's directors and LSS, asking HSBC to waive the verification process for all twenty two policies.   A copy of this letter is attached and incorporated herein as Exhibit 13.   This was a departure from the usual course of dealing between SLS and HSBC.   The directors of SLS and LSS had signed all previous requests to HSBC to waive the parameters.

45.     A waiver was critical, because all twenty two policies were newly issued "contestable" policies.   The term "contestable" describes policies that are rescindable by the issuing carriers, because they were issued less than two years before and therefore were within the "contestability" period.   During that time, an issuing carrier could attempt to rescind a policy that it claims was procured by fraud.   Contestable policies are less valuable in the life settlement market for this reason and thus were ineligible for purchase under SLS's purchase parameters.

HSBC staff noted on their verification checklists that the policies were within the contestability period, but no one at the bank questioned the transaction, even though contestable policies were prohibited in SLS's portfolio except under very limited exceptions not applicable in this case. Instead, at Eber's request, the verification process was abandoned, and Inigo immediately wired $11.3 million from SLS's account to close the sale.

46.     HSBC transferred the money on instructions from Eber written on CIB letterhead, like the waiver. A copy of the instructions is attached and incorporated herein as Exhibit 14. In both instances, HSBC failed to comply with its own procedures for confirming the authority of the person authorizing the transfer for SLS. The previous month the bank had asked CIB to provide evidence of its authority in connection with another policy purchase. What it received was a payment authorization form signed by Eber as an "Authorized Officer of the Customer" and an incumbency certificate on CIB letterhead in relation to Eber's authority to act on behalf of CIB, not SLS. Copies of these forms are attached and incorporated herein as Exhibits 15 & 16. Such documents were not proper proof that Eber was authorized by SLS to give instructions on its accounts.

47.     The events of December 27, 2007 demonstrate that Inigo was under pressure from Eber to process the waiver and release of funds quickly. Emails between Eber and Ian Subel at LSS suggest that they were under a deadline with only minutes to spare. Both the waiver and wiring instructions were hastily prepared on CIB letterhead, signed only by Eber and faxed to Inigo, who agreed to stand by the fax machine until they arrived. Eber thanked Inigo profusely for accommodating him and emailed Inigo "Your [sic] a star!" HSBC wired the initial $11.3 million installment payment immediately to LSC's escrow account at Stroock. Stroock subsequently wired the installment to an account in the Channel Islands for the benefit of an

entity identified as Applejack Holdings.   Applejack was the vehicle through which Elias tried to purchase Amazon land.

48.   In its eagerness to please CIB, HSBC let SLS's funds move out of its account without proper authorization and in breach of its duty to exercise skill and reasonable care in carrying out activities for its customer.   At no time did HSBC have proper verification of the authority of CIB and Eber to direct payments on behalf of SLS, including the transfer of $11.3 million to Stroock's escrow account.

49.   The waiver of the purchase parameters for a large block of policies was unprecedented in the course of dealing between SLS and HSBC.  In addition, LSC owned SLS so that SLS's purchase of assets from LSC was not an arms' length transaction.  Both factors should have prompted HSBC to give closer scrutiny to the transaction.  The two companies had different bondholders, whose interests were not aligned.

50.   HSBC was aware that CIB's directive to close the deal with LSC without completing the verification process was contrary to the SLS directors' earlier instructions.  By nonetheless agreeing to Eber's request and wiring the purchase money out of SLS's account, HSBC allowed CIB to breach its fiduciary duty and chose to look the other way.  HSBC also allowed CIB to invest SLS's money heavily in the contestable market in conflict with the SLS's purchase parameters, thereby subjecting the SLS bonds to the undisclosed risk that contestable policies might be rescinded if an insurer showed they were procured by fraud.

**D.     HSBC turned a blind eye to Elias' and CIB's 2008 fire sale of the collateral.**

51.   Through several transactions in 2008, Elias and CIB proceeded with a plan to liquidate SLS's entire portfolio of policies.  Their plan was to take the funds from these sales and reinvest a portion in high ratio policies (i.e., high face value to purchase price), including

"jumbo" and contestable policies, for the purpose of nominally satisfying the RAC requirements. The "jumbo" policies would have helped SLS meet RAC requirements in the short-term but worsened SLS's long-term financial prospects, because they had longer life expectancies and higher annual premium payments. The contestable policies likewise would have helped satisfy the RAC in the short run, but were less marketable during their contestability period and bore the risk of rescission.

52. When HSBC learned that the existing portfolio was being sold off, it saw this as a "business development" opportunity. An internal memorandum to this effect is attached and incorporated herein as Exhibit 17. HSBC offered to expedite the transfer of the policies to the purchasers by opening securities intermediary accounts for them in which the policies could be held until the insurer processed the change of ownership and beneficiary forms. That way the policies were moved quickly out of SLS's account, while charging fees to the purchasers for opening a new account. HSBC would profit from its relationship with SLS even as it waited to be replaced.

53. By April 2008, HSBC knew that CIB was liquidating the policies quickly without replacing them and that the portfolio would soon be sold off. A copy of an email informing HSBC of this is attached and incorporated herein as Exhibit 18. HSBC turned a blind eye to the fact that the policies were being sold at deep discounts and that this fire sale was depleting the bond collateral. Nor did the earlier "red flags" about a Ponzi scheme and Elias' involvement prompt HSBC to scrutinize the frenetic liquidation of SLS's portfolio.

54. On several occasions, CIB informed HSBC that a deal to sell a certain block of SLS policies needed to close in a matter of days or even hours. HSBC not only failed to question the rapid liquidation of SLS's portfolio but also eagerly assisted with the sales because of its own

interest in closing the SLS account as quickly as possible and in earning additional fees from the purchasers along the way. Despite its awareness that SLS's account held collateral for the bonds, HSBC ignored multiple "red flags" that should have led it to investigate suspicious activity at SLS and ensure that the proceeds of the policy sales were not being misappropriated. These "red flags" included the following:

a)      SBC was well aware of what its own officer called the "ugly history" of the life settlement industry, and the bank's Fiduciary Risk Management Committee was concerned about the risk posed by transactions related to life settlements;

b)      HSBC received warnings in December 2005 that the whole Keydata structure looked like a "Ponzi scheme;"

c)      HSBC was aware of SLS's prolonged difficulty finding another bank to replace it as securities intermediary and verification/payment agent. HSBC was repeatedly assured that a deal was imminent, but it was never completed;

d)      HSBC was aware of SLS's chronic cash shortage and of "near misses" with regard to scheduled premium payments. It frequently contacted SLS representatives to alert them that there were insufficient funds in its account with which to pay premiums or purchase policies;

e)      HSBC became aware in early 2008 that SLS urgently needed to borrow against the policies HSBC held title to for the account of SLS. To accomplish this, HSBC was asked to sign the necessary policy loan requests, which the bank declined to do for tax reasons;

f)      From numerous e-mails it received from CIB notifying it of potential sales, and from the records that it maintained on the purchase price and face value of each SLS policy in its custody, HSBC would have been aware that SLS was selling the policies at a small fraction of their face value (as low as 5-10%) and for far less than the policies had been purchased. HSBC was also informed in almost every case that it was imperative for the parties to close the sale in a matter of days at the insistence of SLS's (unnamed) principal.

g)      HSBC was requested to assist with such "fire drills" by agreeing to open a securities intermediary account for each purchaser and transfer the policies there so that SLS could be paid immediately, rather than have the funds held in escrow, which was the more usual practice;

h)      HSBC became aware of changes in SLS's board of directors in April 2007 and again only a year later in April 2008.  However, HSBC never inquired about the reasons for the rapid turnover in the entity's governance.

55.      Despite all of these "red flags," HSBC failed to conduct an inquiry into the SLS's reasons for rapidly selling off all of its policies at deep discounts.  HSBC was intent on exiting the life settlement industry and terminating one of its last remaining such accounts.  HSBC's internal notes show it was also motivated to earn additional fees by opening accounts for each buyer to facilitate the purchase of SLS policies.

56.      When the sell off of SLS's policies began, there were still valuable assets in the SLS portfolio that HSBC held.  Had HSBC made inquiries at that point and taken steps to ensure that the bondholders' interests were being protected, the looting of those assets could have been averted and, with an orderly liquidation, bondholders would have been able to recover a significant portion of their original investment.

57.      When the last of the sales was completed and SLS's assets dissipated, CIB lavished praise on HSBC for its role in aiding and assisting the dissipation.  After HSBC confirmed that only three policies (out of 143) remained in the SLS account, CIB replied, "[we] would like to convey huge thanks to the team at HSBC for being so accommodating to SLS Capital whilst the Directors have been liquidating the portfolio."

E.      **HSBC's Gross Negligence Permitted the Stocker Policy Lapse**

58.      On or about January 6, 2006 SLS acquired life insurance policy #60110501 issued by Transamerica Occidental Life Insurance Company (Transamerica) on September 6, 2003 with face value in the amount of $6,000,000 on the life of Margaret Stocker (the "Stocker Policy").  To close the deal, SLS paid $2,047,580 for the policy, $502,420 in broker's fees, and $150,000

to LSS in origination fees, for a total of $2,700,000 in acquisition costs plus incidental expenses. HSBC, under the Securities Account Control Agreement, became legal owner of the policy.

59.     Pursuant to Section 3(d) of the Securities Account Control Agreement with SLS, HSBC was required to direct Transamerica to list HSBC's address for receipt of all documentation from the Issuer, as that of LSS in San Diego, attention LSS's owner, Larry Simon.  The purpose of Section 3(d) was to allow LSS as servicer of the Policy to receive all premium, lapse and other notices from Transamerica as quickly as possible.

60.     HSBC failed to notify Transamerica to direct all communications to LSS, so Transamerica sent all communications directly to HSBC.

61.     Pursuant to Section 3(a) of SLS's Securities Account Control Agreement, HSBC was required to forward to LSS as Servicer and SLS copies of all documents received with respect to the Stocker Policy.  Pursuant to Section 3(b) of the Agreement, HSBC was required promptly to forward by facsimile, electronic transmission or overnight courier to LSS and SLS any grace notice or lapse notice that it received from Transamerica with respect to the Stocker Policy.

62.     HSBC occasionally failed to deliver to LSS all premium notices, grace notices and lapse notices received from Transamerica concerning the Stocker Policy.  From on or about June 7, 2006 through October 13, 2006, an employee of HSBC failed to forward nearly 200 pieces of correspondence from insurance companies to LSS, including around 80 premium notices.  HSBC did not discover the full extent of this failure until on or about October 24, 2006.

63.     HSBC failed to forward premium notices for the Stocker Policy for premium payments due in October, November and December 2006 as well as other documentation.  As a

result, LSS did not request funds from HSBC for those payments and HSBC did not fund such payments as required by the Verification and Payment Agency Agreement with SLS.

64.    On January 24, 2007, Transamerica sent to HSBC notice that the Stocker Policy had entered its grace period indicating that if the premium was not paid by March 26, 2007 the Stocker Policy would lapse.  HSBC failed to forward such notice to LSS.

65.    On or about May 9, 2007, Transamerica sent to HSBC notice that no premiums had been received within the time required by the previous notice and that the Stocker Policy had lapsed.

66.    LSS and HSBC attempted without success to persuade Transamerica to reinstate the policy.

67.    Margaret Stocker died on November 15, 2008.

68.    But for HSBC's failure to forward all premium, grace and lapse notices from Transamerica to LSS as required by the Securities Account Control Agreement, and its failure to fund premium payments as required by the Verification and Payment Agency Agreement, HSBC would have received payment of $6 million from Transamerica for the benefit of SLS upon the death of Margaret Stocker.

## COUNT ONE
### (Aiding and Abetting the Fraud of David Elias)

69.    Paragraphs 1 through 68 are hereby repeated and re-alleged as though more fully set forth herein.

70.    David Elias committed fraud upon the investors in SLS's bonds.

71.    Defendant HSBC provided knowing and substantial assistance to David Elias in connection with Elias' defrauding of SLS and its bond investors.

72.     HSBC acted with reckless disregard and/or exhibited willful blindness toward the fraud being perpetrated by Elias, and therefore knew or is charged with knowledge that its material assistance was in furtherance of a fraudulent scheme.

73.     Plaintiffs suffered substantial damages as a result of HSBC's aiding and abetting of the Elias fraud.

**COUNT TWO**
**(Aiding and Abetting the Fraud of Keydata)**

74.     Paragraphs 1 through 73 are hereby repeated and re-alleged as though more fully set forth herein.

75.     Keydata committed fraud upon the investors in SLS's bonds.

76.     Defendant HSBC provided knowing and substantial assistance to Keydata in connection with Keydata's defrauding of SLS and its bond investors.

77.     HSBC acted with reckless disregard and/or exhibited willful blindness toward the fraud being perpetrated by Keydata, and therefore knew or is charged with knowledge that its material assistance was in furtherance of a fraudulent scheme.

78.     Plaintiffs suffered substantial damages as a result of HSBC's aiding and abetting of the Keydata fraud.

**COUNT THREE**
**(Aiding and Abetting the Fraud of CIB)**

79.     Paragraphs 1 through 78 are hereby repeated and re-alleged as though more fully set forth herein.

80.     CIB committed fraud upon the investors in SLS's bonds.

81.     Defendant HSBC provided knowing and substantial assistance to CIB in connection with CIB's defrauding of SLS and its bond investors.

82.     HSBC acted with reckless disregard and/or exhibited willful blindness toward the fraud being perpetrated by CIB, and therefore knew or is charged with knowledge that its material assistance was in furtherance of a fraudulent scheme.

83.     Plaintiffs suffered substantial damages as a result of HSBC's aiding and abetting of the CIB fraud.

**COUNT FOUR**
**(Aiding and Abetting Breach of Fiduciary Duty of David Elias)**

84.     Paragraphs 1 through 83 are hereby repeated and re-alleged as though more fully set forth herein.

85.     As principal of SLS, Elias had a fiduciary duty toward SLS and to the investors in SLS's bonds.

86.     Defendant HSBC provided knowing and substantial assistance to Elias in connection with Elias's breach of duties owed to SLS and its bond investors.

87.     HSBC acted with reckless disregard and/or exhibited willful blindness toward the breaches of duty being perpetrated by Elias, and therefore knew or is charged with knowledge that its material assistance was in furtherance of those breaches of duty.

88.     Plaintiffs suffered substantial damages as a result of HSBC's aiding and abetting of the breaches of fiduciary duty by Elias.

**COUNT FIVE**
**(Aiding and Abetting Breach of Fiduciary Duty by CIB and Eber)**

89.     Paragraphs 1 through 88 are hereby repeated and re-alleged as though more fully set forth herein.

90.     As Advisor to SLS, CIB had a fiduciary duty toward SLS and to the investors in SLS bonds.

91.     As principal of CIB, Arnold Eber had a fiduciary duty toward SLS and to the investors in SLS's bonds.

92.     Defendant HSBC provided knowing and substantial assistance to CIB and Eber in connection with their breach of duties owed to SLS and its bond investors.

93.     HSBC acted with reckless disregard and/or exhibited willful blindness toward the breaches of duty being perpetrated by CIB and Eber, and therefore knew or is charged with knowledge that its material assistance was in furtherance of those breaches of duty.

94.     Plaintiffs suffered substantial damages as a result of HSBC's aiding and abetting of the breaches of fiduciary duty by CIB and Eber.

## COUNT SIX
### (Breach of Fiduciary Duty)

95.     Paragraphs 1 through 94 are hereby repeated and re-alleged as though more fully set forth herein.

96.     HSBC was held out to investors as the US Trustee safeguarding the assets in their custody which served as collateral for the SLS bonds.  HSBC denied that it served as trustee but rather served only as custodian.  HSBC became aware, in or about November 2005, that it had been repeatedly represented to the SLS investors that HSBC was, in fact, trustee.  These investors reasonably relied upon these representations regarding the role of HSBC.  Despite knowing that investors had been led to believe that HSBC served as US Trustee, HSBC failed to take adequate steps to ensure that the information previously given was corrected.

97.     HSBC continued to function in its role with respect to the SLS bonds through December 31, 2008.  At no point did HSBC correct the information previously disseminated to investors regarding HSBC's role.

98.     HSBC, through its conduct and its failure to correct previously disseminated information received by investors, became a fiduciary and/or a fiduciary by estoppel with respect to the SLS investors.

99.     As set forth more fully above, HSBC failed to properly investigate "red flags" which were evident with regard to Elias', CIB's and Keydata's fraud upon investors.

100.    HSBC failed to investigate or report suspicious activities which it had become aware of, or should have become aware of, had they investigated various "red flags," including the warnings it received that the SLS accounts might be involved directly or indirectly with a "Ponzi" scheme.

101.    In its failure to properly safeguard the SLS assets under its custody and care, HSBC breached its fiduciary duty toward the SLS bond investors.

102.    Plaintiffs suffered substantial damages as a result of HSBC's breaches of fiduciary duty.

## COUNT SEVEN
### (Negligence – Breach of the Duty of Inquiry)

103.    Paragraphs 1 through 102 are hereby repeated and re-alleged as though more fully set forth herein.

104.    HSBC failed to meet the standard of care required for the monitoring, oversight and supervision of the SLS customer account.

105.    HSBC negligently failed to investigate suspicious activities and "red flags" of which it became aware, including the warnings it received that the SLS accounts might be involved directly or indirectly with a "Ponzi" scheme.  HSBC's awareness of suspicious activities, coupled with its knowledge that bondholders investing in Keydata's Secure Income Bond perceived it to be acting as US Trustee for the bond, imposed on the bank a duty to make

inquiries and endeavor to prevent a misappropriation of the assets in SLS's account which it knew were collateral for the bond.

106.    As a result of HSBC's negligence, Plaintiffs suffered substantial money damages.

## COUNT EIGHT
### (Negligence – Unauthorized Transfer of Funds)

107.    Paragraphs 1 through 106 are hereby repeated and re-alleged as though more fully set forth herein.

108.    In December 2007 HSBC transferred $11.3 million from SLS's cash account to LSC's escrow account at Stroock, ostensibly in payment for beneficial interests being acquired by SLS in twenty two life insurance policies owned by life insurance trusts.  HSBC was not contractually obligated to assist with this transaction, because the policies were not acquired from LSS, and SLS was not obtaining direct ownership of the policies.

109.    HSBC moved $11.3 million out of SLS's cash account on instructions from Eber written on CIB letterhead.  HSBC never obtained proper evidence of Eber's authority on SLS letterhead, signed by the directors of SLS.

110.    HSBC failed to comply with its own procedures for verifying the authority of persons purporting to give instructions on behalf of SLS.

111.    HSBC breached its duty to exercise reasonable skill and care in maintaining SLS's cash account.

112.    As a result of HSBC's negligence, SLS suffered direct damages of $11.3 million, at a minimum, plus interest.

## COUNT NINE
### (Breach of Contract – Unauthorized Waiver of Policy Purchase Parameters)

113.    Paragraphs 1 through 112 are hereby repeated and re-alleged as though more fully set forth herein.

114.    In December 2007 the directors of SLS requested that HSBC verify that interests in twenty two policies being purchased from LSC conformed to SLS's purchase parameters as referenced in the Verification and Payment Agency Agreement.

115.    HSBC initially undertook to review the policy documentation in order to confirm that the policies met each purchase parameter, but then aborted the process on written instructions from Eber, who provided a waiver of the purchase parameters.  Such a waiver could only be given by SLS, and HSBC never insisted on proof that Eber was authorized by SLS to give such instructions on its behalf.

116.    The twenty two policies in which SLS obtained a beneficial interest were contestable (and thus less valuable) policies that were prohibited in SLS's portfolio, and would not have been eligible for purchase without Eber's waiver of SLS's policy purchase parameters. The interests were sold less than a year later at a loss of approximately $7.3 million.

117.    HSBC's failure to complete the verification process for the twenty two policies and otherwise perform its duties under the Verification and Payment Agency Agreement constituted a material breach of contract.

118.    As a proximate result of HSBC's breach of contract, SLS received policy interests that were less valuable in the life settlement market than policies conforming to SLS's purchase parameters, and it thereby suffered damages of no less than $7.3 million.

## COUNT TEN
### (Breach of Contract – the Stocker Policy)

119.     Paragraphs 1 through 118 are hereby repeated and re-alleged as though more fully set forth herein.

120.     As set forth more fully above, HSBC failed to instruct Transamerica to direct all premium, grace and lapse notices relating to the Stocker Policy to LSS's address.  HSBC also failed to forward to LSS all notices in relation to the Stocker Policy received from June 7, 2006 through October 13, 2006.  HSBC's failure, after learning of its employee's failure to forward premium, grace and lapse notices to LSS, to ensure that future payments would not be missed and to make up for lost payments was gross negligence, as was HSBC's failure to detect that premiums were not being paid and to inquire as to the cause.

121.     HSBC's actions were in violation of the Securities Account Control Agreement and the Verification and Payment Agency Agreement.

122.     As a proximate result of HSBC's breach of contract, SLS did not receive a death benefit under the Stocker Policy upon the insured's death in November 2008 and thereby suffered damages in the amount of $6 million, plus interest.

## COUNT ELEVEN
### (Common Law Indemnification Against HSBC)

123.     Plaintiff hereby incorporates by reference paragraphs 1 through 122 as if fully set forth herein.

124.     SLS has incurred or will incur claims from bondholders for losses arising from HSBC's wrongful conduct, and in addition has incurred and will incur expenses associated with responding to those claims.

125.    In law and equity, HSBC bears responsibility for the satisfaction of bondholder claims against the Estate of SLS, along with costs and expenses, including attorneys' fees, of SLS associated therewith.

**WHEREFORE,** Plaintiff demands relief from HSBC as follows:

1.    Compensatory damages in amounts to be determined at trial but not less than $250 million;

2.    In the alternative, and as to Count Ten, an Order requiring HSBC to pay all bondholder claims as may be allowed or accepted by the Liquidator SLS within 10 (ten) days of notice of acceptance or allowance, together with all interest payable upon such claims and all expenses incurred by SLS (including attorneys' fees) in connection with administering such claims;

3.    Punitive and exemplary damages in an amount according to proof to the extent permitted by law;

4.    Attorneys' fees and costs against HSBC to the extent permitted by law;


**[REMAINDER OF THIS PAGE IS LEFT INTENTIONALLY BLANK]**

5.    Prejudgment interest; and

6.    For such other and further relief as the Court deems appropriate.

Respectfully yours,

Dated: Baltimore, Maryland          Dated: New York, New York
       August 22, 2014                     August 22, 2014

COHEN & BUCKLEY, LLP                SPIZZ COHEN & SERCHUK, P.C.

By: _s/ Michael L. Cohen_____    By: _____
       Michael L. Cohen                   Alex Spizz, Esq. (AS-5508)
       (Motion for Admission *Pro Hac Vice*        Joseph P. Cervini, Jr., Esq. (JC-6413)
       pending)                     425 Park Avenue
       Richard P. Regan, Of Counsel  New York, NY 10022
       James R. Stirn, Of Counsel    (212) 754-9400
1301 York Road
Baltimore, MD 21093
(410) 321-4750

*Attorneys for Plaintiff, SLS Capital, S.A.*    *Attorneys for Plaintiff, SLS Capital, S.A.*
*(In Liquidation) Maître Yann Baden, Foreign*   *(In Liquidation) Maître Yann Baden, Foreign*
*Representative*                                *Representative*

30